1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lenda Charmaine Cyprain,<br><br>                           Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner<br>of Social Security,<br><br>                           Defendant. | Case No.:  15cv2413-BAS-BGS<br><br>**REPORT AND<br>RECOMMENDATION** |

## I.   PROCEDURAL BACKGROUND

Lenda Charmain Cyprain ("Plaintiff") filed an application for disability insurance benefits on June 29, 2011, alleging disability commencing on April 14, 2009.  (ECF No. 9, Administrative Record "AR" at 156-64.)  Her claim was originally denied on October 3, 2011 (*id.* at 90-94), and upon reconsideration on June 29, 2012.  (*Id.* at 102-04.)  After a hearing on July 18, 2013 (*id.* at 52-72), Administrative Law Judge ("ALJ") Sherwin F. Biesman issued a decision denying the application on March 8, 2014.  (*Id.* at 28-38.)

On May 1, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision.  (*Id.* at 19-24.)  This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1383(c).  Plaintiff filed her Motion for Summary Judgment on February 26, 2016.  (ECF No. 11)  In her motion for summary judgment,

Plaintiff argues that the ALJ erred in finding her mental impairments and carpal tunnel syndrome not severe.  (*Id.*)  Defendant filed her cross Motion for Summary Judgment on March 25, 2016.  (ECF No. 14.)  Plaintiff filed a reply on April 8, 2016.  (ECF No. 16.)

## II.    LEGAL STANDARD FOR DETERMINATION OF A DISABILITY

In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  *Id.* The applicant has the burden to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

The Secretary of the Social Security Administration set forth a five-step sequential evaluation process for determining whether a person has established his or her eligibility for disability benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The five steps in the process are as follows:

1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520C, 416.920C.

3.  Does the impairment "meet or equal" one or more of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§

404.1520(e), 416.920(e).

5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof during steps one through four.  *Id.* at 953.  The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy").  If the Commissioner fails to meet this burden, then the claimant is disabled.  If, however, the Commissioner proves that the claimant is able to perform other work that exists in significant numbers in the national economy, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54.  Here, the ALJ determined that Plaintiff did not have any severe impairments, and did not proceed beyond step two.

## III.   MEDICAL RECORDS AND EVALUATIONS PRE-HEARING

The Court has synthesized Plaintiff's medical records for the purpose of providing context to its analysis of the issues.  This summary, however, does not purport to be exhaustive of every detail contained in the administrative record.

### A. Treatment Notes from Dr. George Malone, M.D.

Plaintiff saw Dr. Malone on October 15, 2010 as a new patient.  (AR at 419.)  She complained of body aches and "SOB."[1]  (*Id.*)  Dr. Malone assessed Plaintiff with anxiety.  (*Id.*)  On December 3, 2010, Plaintiff saw Dr. Malone and complained of right hand weakness, slight compared to her left hand.  (*Id.* at 415.)  Dr. Malone noted no other neurological symptoms.  (*Id.*)  Plaintiff saw Dr. Malone on July 01, 2011 for complaints

---

[1] The Court understands this to refer to "shortness of breath."

of back pain, wrist pain, and depression.  (*Id.* at 394.)  On July 29, 2011, Plaintiff saw Dr. Malone for a follow up visit wherein she reported numbing in both of her hands.  (*Id.* at 387.)

### B. Treatment Notes from Rachelle Rene, Ph.D., psychologist

On referral from Dr. Malone, psychologist Rachelle Rene, Ph.D. conducted an initial assessment of Plaintiff on May 31, 2011.  (*Id.* at 403-08.)  Dr. Rene noted that Plaintiff presented with symptoms of depression, including crying spells, decreased motivation, decreased energy, difficulty sleeping, increased weight gain, increased isolation, and restlessness.  (*Id.* at 403.)  Plaintiff reported a history of trauma, and complained of being "very tired" and "depressed."  (*Id.*)  Plaintiff also reported a past suicide attempt around 2009-2010 while in jail, and current suicidal ideation without intent or plans.  (*Id.* at 405.)  Plaintiff reported little to no interaction and limited support system, and that her depression has affected all levels of her functioning.  (*Id.* at 404.)

Dr. Rene assessed Plaintiff as depressed, tearful, and anxious, but noted that Plaintiff appeared coherent.  (*Id.* at 403.)  Dr. Rene diagnosed Plaintiff with Major Depressive Disorder, recurrent, moderate, without psychotic features and Generalized Anxiety Disorder.  (*Id.* at 403, 406.)

#### 1.  June 2011 Treatment Notes

On June 07, 2011, Plaintiff reported to Dr. Rene that she was not engaging in social activities with friends or family, but stated that she would like to be more independent.  (*Id.* at 401-02.)  On June 14, 2011, Plaintiff discussed previous suicidal ideations and visions of hurting herself, but denied current intent.  (*Id.* at 398-99.)  On June 21, 2011, Plaintiff stated that she felt more depressed and was visibly tearful.  (*Id.* at 397.)  She acknowledged some suicidal ideations, but denied intent or plans to harm herself.  (*Id.*)  On June 28, 2011, Plaintiff presented in a good mood and stated that felt "a lot better."  (*Id.* at 395.)  Plaintiff denied suicidal ideation at that time.  (*Id.*)

#### 2.  July 2011 Treatment Notes

On July 12, 2011, Plaintiff presented with sad mood and stated that she stayed in bed since last session, but denied suicidal ideation.  (*Id.* at 391.)  On July 19, 2011,

Plaintiff noted a positive change in her mood and behavior after spending time with family. (*Id.* at 389.) On July 26, 2011, Plaintiff reported feeling anxious and depressed due to recent numbness and tingling in her hands/fingers. (*Id.* at 388.) She also described some suicidal ideation, without intent or plan. (*Id.*)

### 3. August 2011 Treatment Notes

On August 04, 2011, Plaintiff reported not doing well and attributed it to her son and daughter-in-law being away. (*Id.* at 385) Plaintiff stated she could not handle being home alone. (*Id.*) On August 16, 2011, Plaintiff stated that she felt upset, tearful, depressed, and isolated after she heard an argument that she interpreted as being about her. (*Id.* at 382.) Plaintiff reported suicidal ideation without intent or plan. (*Id.*) On August 23, 2011, Plaintiff explained that she had a "good week" and with no thoughts of suicidal ideation. (*Id.* at 380) Plaintiff stated that she is starting to "do things again" to decrease her feelings of isolation. (*Id.*) On August 30, 2011, Plaintiff told Dr. Rene that she fell into a depression again where she isolated and experienced crying spells. (*Id.* at 375.) Plaintiff also admitted that she has been using the suicidal ideations at home as a way to "get attention." (*Id.*)

### 4. September 2011 Treatment Notes

On September 06, 2011, Plaintiff reported she had no suicidal ideation "at all" this week and that she is doing better. (*Id.* at 374.) Plaintiff complained of forgetfulness and poor memory. (*Id.*)

### C. Dr. George Brolaski, M.D., Treating Psychiatrist

### 1. Treatment Notes

On August 29, 2011, on referral from Dr. Rene, Plaintiff saw psychiatrist George Brolaski at San Ysidro Behavioral Health for evaluation of her depression. (*Id.* at 376-79). She reported a longstanding history of depression since childhood. (*Id.* at 376.) Plaintiff stated that she continues to be depressed daily with daily crying spells, a lack of interest in former activities, weight gain of about 60 pounds, insomnia, poor memory and concentration, and poor decision-making ability. (*Id.*) She reported having thoughts of death and suicidal ideation but without a plan or present intention. (*Id.*) She also

5

reported auditory hallucinations a few times a month in the form of the voice of her mother.  (*Id.*) Mental status examination revealed a sad and worried expression, agitation, a depressed mood, and suicidal thoughts.  (*Id.* at 378.)  Dr. Brolaski diagnosed Plaintiff with Major Depressive Disorder, recurrent, severe, without psychosis, and assessed her current GAF at 47.  (*Id.* at 379.)

Plaintiff returned to Dr. Brolaski on June 25, 2012 with diminished sleep of only three to four hours per night.  (*Id.* at 589.)  On July 30, 2012, she was still having auditory hallucinations during the night and that she had been living in a rehabilitation facility, which was helping her abstain from using crack.  (*Id.* at 586.)  As of August of 2012, Plaintiff had been sleeping and eating well, with fewer  auditory hallucinations. (*Id.* at 585.)  By September of 2012, she was again not sleeping well due to auditory hallucinations, but she was still abstaining from drug use.  (*Id.* at 584.)  In October of 2012, she was again suffering from both auditory and visual hallucinations, but she had run out of medications the week prior.  (*Id.* at 583.)  In December, her auditory hallucinations had again been interfering with her sleep.  (*Id.* at 581.)

### 2.  Mental Impairment Questionnaire

On June 6, 2013, Dr. Brolaski completed a Mental Impairment Questionnaire based on his treatment of Plaintiff since August of 2011.  (*Id.* at 600-05.)  He noted her diagnoses of Major Depressive Disorder, recurrent, severe, with psychotic features (296.34) with a current GAF of 40, no higher than 40 in the preceding year.  (*Id.* at 600.) He found her "unable to meet competitive standards" in her abilities to maintain regular attendance and be punctual within standard tolerances; to maintain attention for two-hour segments; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted; to complete a normal workday and workweek without interruptions from psychological symptoms; to perform at a consistent pace without rest periods of unreasonable number and length; to get along with co-workers without causing  undue distraction or exhibiting behavioral extremes; to respond appropriately to changes in the routine work setting; to deal with normal work

stress; to be aware of normal hazards and take appropriate precautions; to understand, remember, and carry out detailed instructions; to set realistic goals; to deal with stresses of skilled or semi-skilled work; to make plans independently; to interact appropriately with the general public; and to maintain socially appropriate behavior. (*Id.* at 602-03.) He added that she would likely miss more than four workdays a month due to her conditions. (*Id.* at 605.)

### D. December 28, 2010, Report by Sandra M. Eriks, M.D., Board Certified

Dr. Eriks completed an internal medicine evaluation of Plaintiff on December 28, 2010.[2] (ECF No. 9-7 at 4.)  The report notes that information was obtained from plaintiff, "who is considered a poor historian." (*Id.*)  Plaintiff reported suffering from asthma, hypertension, body pain, seizures, dizziness, stomach sickness, and fecal and urinary incontinence.[3] (*Id.* at 4-5)  Plaintiff reported suffering diffuse body pain, lower back pain, and sharp chest pain. (*Id.* at 4.)  Although Plaintiff complained of joint pain, Plaintiff's joints showed no warmth, redness, or effusion. (*Id.*)  Her grip strength appeared normal. (*Id.*)

Plaintiff stated that she has no domestic responsibilities (e.g. cooking or cleaning). (*Id.* at 5.)  Her daughter-in-law bathes her and people bring her food when she does not feel like going to the table. (*Id.*)  Plaintiff primary activity is sitting on the couch throughout the day. (*Id.*)

Dr. Eriks concluded, based on his examination, that Plaintiff "has no restriction in areas of lifting, carrying, standing, walking, or sitting. No special limitation in standing, walking or sitting.  No postural, manipulative, visual, or communicative limitations. Environmental limitations- no working at hazardous heights, driving motor vehicle or working with hazardous machinery until six months status post most recent seizure." (*Id.*

---

[2] Dr. Eriks sent a correction letter on February 1, 2011 which modified a sentence in the original report. (*See* ECF No. 9-7 at 13.)  This section summarizes the report with this modification.

[3] Because Plaintiff's complaints of carpal tunnel is the only impairment at issue in this appeal, the Court only summarizes the portions of Dr. Erik's report relevant to that analysis.

at 8)

**E. Dr. Ghausi, Treating Neurologist**

On November 3, 2011, Plaintiff saw neurology resident Galina Nikolskaya for evaluation of right arm and right leg paresthesias, neck pain radiating into the arm, and intermittent weakness and loss of balance. (*Id.* at 441-42). The examination revealed limited arm abduction secondary to pain, limited wrist movement on the right, right ABP atrophy, right thenar eminence atrophy, positive Finkelstein's maneuver bilaterally, positive Tinel's sign on the right, and an antalgic gait. (*Id.* at 442-43.) Ms. Nikolskaya's impression was of likely De Quervain's tenosynovitis, carpal tunnel syndrome in the right wrist, and possible cervical radiculopathy, all to be discussed with neurologist Omar Ghausi. (*Id.* at 443.) Neurologist Ghausi later evaluated Plaintiff and found neck pain radiating into the right shoulder, as well as her upper extremity numbness and tingling, and also found positive Finkelstein's maneuver bilaterally, severe atrophy of the right APB, weakness of bilateral APB, severe on the right and mild on the left, and diffuse tenderness at any point of her body. (*Id.* at 440.) Dr. Ghausi assessed severe carpal tunnel syndrome on the right, mild on the left, superimposed upon de Quervain's tenosynovitis, for which he recommended splints, possible steroid injections, and an EMG [electromyography]. (*Id.*) The EMG, dated November 22, 2011, was abnormal, showing median nerve lesion at both wrists consistent with carpal tunnel syndrome, extremely severe on the right and mild to moderate on the left, with no EMG evidence of cervical radiculopathy affecting the right upper extremity. (*Id.* at 436-37, 446-48.)

Plaintiff returned to see Dr. Ghausi on November 29, 2012 with no change in symptoms of hand pain and numbness. (*Id.* at 558.) Notes from this visit state that Plaintiff was assessed with carpal tunnel syndrome, severe on the right. (*Id.*) Dr. Ghausi referred Plaintiff to see an "ortho hand" for consideration of surgical intervention, but stated that she would continue conservative treatments in the meantime. (*Id.*)

///

///

### F.  Internist Evaluation August 26, 2011 by Phong Dao, D.O., Internal Medicine

Phong Dao, D.O., Internal Medicine, completed an Internist Evaluation of Plaintiff on August 26, 2011, at the request of The Department of Social Services, Disability Evaluation Department.  (*Id.* at 362.)  Dr. Dao based his findings on formal testing and his observations of Plaintiff's movements in the waiting room, entering and leaving the office and during the interview.  (*Id.* at 363.)  Dr. Dao provided the following medical source statement:  Plaintiff can stand and walk six hours in an eight hour work day.  Plaintiff can sit six hours in an eight hour work day.  Plaintiff can lift ten pounds frequently, twenty pounds occasionally.  She can stoop or crouch frequently.  There are no limitations on her ability to reach, handle, and feel or with her vision.  (*Id.* at 365.)

### G. Psychiatric Evaluation by Dr. Mounir Soliman, M.D.

State agency examining psychiatrist Mounir Soliman, M.D. conducted a complete psychiatric evaluation of Plaintiff on September 12, 2011, at the request of The Department of Social Services, Disability Evaluation Department.  (*Id.* at 422-427.)  Dr. Soliman identified that Plaintiff drove herself to the clinic for the evaluation.  (*Id.* at 422.)

Dr. Soliman did not determine any problems with Plaintiff's current level of functioning in her activities of daily living.  (*Id.*)  He assessed that she is able to cook, clean, shop and complete errands, take care of personal hygiene, and take care of financial responsibilities.  (*Id.*)  The mental status examination indicated that Plaintiff was pleasant and cooperative, she was alert and oriented, and her memory was intact. (*Id.* at 424-25.)  Plaintiff's mood was depressed, but she denied current suicidal ideations. (*Id.* at 425.)  Plaintiff admitted to auditory hallucinations.  (*Id.*)

Dr. Soliman diagnosed Plaintiff with major depression with psychotic features and post-traumatic stress disorder.  (*Id.*)  He determined that, from a psychiatric standpoint, Plaintiff is able to: (1) understand, carry out, and remember simple and complex instructions; (2) interact with co-workers, supervisors, and the general public; and (3) withstand the stress and pressures associated with an eight-hour workday, and day-to-day

activities.  (*Id.* at 426.)

### H. Psychological Evaluation by Jeremy Trimble, Psy. D.

Dr. Trimble completed a psychological evaluation of Plaintiff on September 7, 2013 at the request of The Department of Social Services, Disability Evaluation Department.  (*Id.* at 606)  The report notes that Plaintiff "did not appear to be entirely credible as a historian."  (*Id.*)  Dr. Trimble reviewed the following records: Psychiatric evaluation dated September 12, 2011 by Mounir Soliman, M.D., as well as a questionnaire completed by Plaintiff.  (*Id.*)  Plaintiff's "chief complaint" during this evaluation was that she has a learning disability, specifically "understanding and remembering things."  (*Id.*)

Plaintiff reported that she was not prescribed any medications and was not aware of any family psychiatric history.  (*Id.* at 607.)  Plaintiff indicated that she does not drink, but that she had difficulty with alcohol in the past.  (*Id.*)  She reported smoking five to ten cigarettes a day but denied using any "illicit substances presently or in the past."  (*Id.*)

Plaintiff stated that she can do household chores, errands, shopping, driving and cooking.  (*Id.* at 608.)  She dresses herself, bathes herself, and takes care of her personal hygiene.  (*Id.*)  She denied doing any outside activities or having any hobbies.  (*Id.*)  She is financially supported by her family, but is capable of paying her own bills and handling her own money.  (*Id.*)

Dr. Trimble performed a mental status examination of Plaintiff.  (*Id.*)  He noted that Plaintiff did not appear to be completely genuine or truthful and at times appeared to be exacerbating her deficiencies.  (*Id.*)

With respect to Plaintiff's thought processes, Dr. Trimble stated that she "was coherent and organized."  (*Id.*)  Dr. Trimble reported "no evidence of a thought disorder or psychosis.  (*Id.*)  Plaintiff reported her mood as "down" but with no "observable evidence of depression."  (*Id.* at 609.)  With respect to Plaintiff's intellectual functioning, Dr. Trimble stated that Plaintiff was "credible in the Mental Status Examination portion of the interview and it is considered an accurate assessment.  She was alert and oriented

in all spheres.  She appeared to be of low-average intelligence." (*Id.*)

Dr. Trimble stated in his report that the results of this assessment "are not considered to be a good representation of claimant's psychological functioning, as she did not appear to put forth much effort.  While she may display some mild cognitive deficiencies associated with depression, she appeared to be exaggerating these symptoms in order to appear more disabled than she actually is.  Accordingly, these results should be interpreted with caution." (*Id.* at 610.)

Based on Plaintiff's presentation, self-report, and the obtained scores from psychological testing, Dr. Trimble concluded that Plaintiff appeared to meet the diagnostic criteria for a depressive disorder, but noted that the symptoms she reports "do not appear to impair her ability to participate in activities of daily living or to be gainfully employed." (*Id.* at 612-13.)  Dr. Trimble concluded that, "[f]rom a psychological perspective alone, [he does] not believe she would be impaired in her ability to work if she gave fair effort." (*Id.* at 613.)

## IV.   HEARING BEFORE THE ALJ

### A. Plaintiff's Testimony

Plaintiff testified that she has lived with her adult son, daughter-in-law, and granddaughter in San Diego, California since 2010.  (*Id.* at 56.)  She completed high school, but has not worked in the last twenty years.  (*Id.* at 57.)  Plaintiff testified that she is physically unable to work.  (*Id.* at 58.)  She cannot lift anything because of her legs and right hand.  (*Id.*)  She is unable to hold a broom handle or mop in her right hand, she is unable to cook or clean.  (*Id.*)  Plaintiff claims that her "first doctor, Malone [phonetic]" prescribed a cane for walking because Plaintiff loses her balance and "falls a lot." (*Id.* at 63.)

Plaintiff also testified that she is not fit to work around people because she is mentally unstable and has "a tendency of going off," which she described as inexplicable tantrums.  (*Id.* at 58.)  Because of the tantrums, Plaintiff avoids others and remains in her room most of the day.  (*Id.*)  Plaintiff testified that she was stressed out and depressed.

(*Id.*)  Plaintiff does not know the reason for the stress.  (*Id.*)  According to Plaintiff, her depression has led to suicide attempts.  (*Id.*)  Plaintiff testified that she sees a psychiatrist on a monthly basis.  (*Id.* at 63.)

Plaintiff takes ten different medications for pain, depression, nerves, anxiety, and chronic obstructive pulmonary disease (COPD).  (*Id.* at 60.)  Although she does not know what side effects are strictly attributable to the medications, Plaintiff claims that she suffers from dizziness, drowsiness, and blackouts.  (*Id.*)  Plaintiff admits the medications help "a little bit," but "it all depends on the weather" because the arthritis in her knee and left side of her body is temperature sensitive.  (*Id.* at 64)

Plaintiff testified that she suffers from daily back-to-back seizures that last about five minutes and effect Plaintiff's memory.  (*Id.* at 59, 66.)  Although Plaintiff does not remember her behavior during a seizure, she has been told that she tries to fight or hit others when she is having a seizure.  (*Id.* at 66)  Plaintiff claimed that she suffered a seizure at home the night before the hearing.  (*Id.* at 61.)

### B. Betty Horn's Testimony

Betty Horn testified on behalf of Plaintiff at the hearing.  (*Id.* at 66.)  She knows Plaintiff because her niece is married to Plaintiff's son.  (*Id.* at 68.)  She sees Plaintiff three and five times a month.  (*Id.*)  Ms. Horn saw that Plaintiff was having a "mild" seizure the night before the hearing.  (*Id.*)  She knows what seizures look like because her grandson has autism and has them.  (*Id.*)  When Plaintiff has seizures she "goes out of it . . . she's just in a daze."  (*Id.* at 68-69.)  Sometimes Plaintiff is unconscious, and sometimes she is "zoned out."  (*Id.* at 69.)  The seizures last about five minutes.  (*Id.*)  Plaintiff is not aware of where she is during these seizures, and has a blank look on her face.  (*Id.*)  She is non-responsive.  (*Id.*)

### C. ALJ's Findings

On March 8, 2014, the ALJ issued his decision denying Plaintiff's application for supplemental security income.  (*Id.* at 38.)  In reaching his decision, the ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20

C.F.R. § 404.1520 and described above.[4]  (*Id.* at 28-38.)

### 1.  Step One

The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 29, 2011, her application date.  (*Id.* at 30.)  Accordingly, the ALJ determined the Plaintiff satisfied step one.  (*Id.*)

### 2.  Step Two

At step two, the ALJ found that Plaintiff had the following medically determinable impairments: obesity, depressive disorder, history of asthma, carpal tunnel syndrome, fibromyalgia and seizure disorder.  (*Id.*)  After reviewing the medical records, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that has significantly limited, or is expected to significantly limit, the ability to perform basic work related activities for twelve consecutive months.  (*Id.* at 33.)  He, therefore, concluded that Plaintiff does not have a severe impairment or combination of impairments.  (*Id.*)  In reaching this conclusion, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  (*Id.* at 34.)  The ALJ also considered opinion evidence.  (*Id.*)

In considering Plaintiff's symptoms, the ALJ must follow a two-step process in which it first must be determined whether there is an underlying medically determinable physical or impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms.  (*Id.*)  The ALJ determined that medical evidence establishes that Plaintiff has these impairments and that they could reasonably be expected to produce the alleged symptoms.  (*Id.* at 33, 35.)  However, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the alleged symptoms are not entirely credible because the available medical evidence does not support the alleged degree of functional limitation.  (*Id.* at 35.)  Therefore, the ALJ

---

[4] The Court only summarizes those portions of the ALJ's opinion relevant to the issues in dispute.

concluded that there is insufficient support to conclude that Plaintiff has a single severe impairment or a severe combination of impairments.  (*Id.*)

### a.  Fibromyalgia and Carpal Tunnel Syndrome

The ALJ noted that apart from various pain medications, there is no indication that Plaintiff has required surgery, physical therapy, or pain management for her complaints of fibromyalgia and carpal tunnel syndrome.  (*Id.*)  The ALJ relied on consultative medical examinations conducted in December 2010 and August 2011 that did not indicate signs of arthritis, radiculitis, neuropathy, or other serious exertional or postural limitations.  (*Id.*)  The ALJ noted that Plaintiff failed to attend several scheduled rheumatology evaluations for her body pain complaints, and that there is no evidence that she continued with any treatment for her reported carpal tunnel syndrome or pain complaints.  (*Id.* at 35-36.)  The ALJ additionally found that aside from records that indicate carpal tunnel syndrome in November 2011 and November 2012, there is no further evidence of complaints regarding wrist pain.  (*Id.* at 36.)  Finally, the ALJ concluded that no treating or examining medical source has assessed Plaintiff as wholly incapable of sustaining work activity due to any medical condition.  (*Id.* at 36.)

### b.  Depressive Disorder

The ALJ also determined there was insubstantial evidence to support a finding of a severe mental impairment.  (*Id.*)  The ALJ noted that the record does not indicate that Plaintiff has required any inpatient psychiatric care and that, despite attending outpatient therapy sessions, Plaintiff has consistently performed well upon mental status testing. (*Id.*)  The ALJ once again found that Plaintiff has been inconsistent in her complaints, noting a particular difference depending on to whom she is speaking.  (*Id.*)  During her routine visits to the San Ysidro Behavioral Health Center between 2011 and 2013, Plaintiff regularly reported feeling fine and generally denied issues with suicidal ideation or psychosis, yet during Dr. Soliman's evaluation for her SSI claim in September 2011, she alleged symptoms of auditory hallucinations that were unsubstantiated upon examination.  (*Id.*)  The ALJ notes that neither the September 2011 consultative

psychiatric evaluation nor the September 2013 consultative psychological evaluation showed any mental restrictions in Plaintiff's ability to function in a work setting.  (*Id.*)

### c.  Treating Physician's Opinion

The ALJ acknowledged that in June 2013, Plaintiff's treating physician, Dr. Brolaski, assessed Plaintiff as effectively having marked deficits in virtually all areas of work-related mental functioning.  (*Id.*)  However, the ALJ found that the physician's opinions were not persuasive or controlling in light of the overall record, given that his assessment does not consider other factors that must be evaluated by the ALJ, such as the other medical reports and opinions and the vocational factors involved.  (*Id.*)

The ALJ found that the previous medical evaluations by this physician and the record as a whole contradict a finding that Plaintiff's medical condition is of disabling severity, and that the physician does not provide an assessment of Plaintiff's residual functional capacity (RFC) which is compatible with the record as a whole.  (*Id.*)  The ALJ did not find a basis of support for the severity of Dr. Brolaski's assessment of Plaintiff's condition considering his prior mild clinical findings, the lack of more intensive treatment, and the findings and assessments of the consultative examiners.  (*Id.*)

### d.  Plaintiff's Credibility

The ALJ noted that because Plaintiff's allegations of disability are based primarily on subjective symptoms, her credibility is a material factor.  (*Id.* at 37.)  Based on the repeated inconsistencies and contradictions in the evidence, the ALJ concluded that Plaintiff is not credible.  (*Id.*)  The ALJ found several factors that undermine Plaintiff's general credibility.  (*Id.* at 36.)  The ALJ considered that Plaintiff has been inconsistent in statements regarding her mental health issues, alternating between assertions of depression based on a traumatic personal history and claims of a learning disorder.  (*Id.* at 37.)  The ALJ found Plaintiff's denial of limitations in her ability to perform daily living activities in consultative evaluations to be thoroughly inconsistent with her claims at the hearing and in the disability reports, where she reported minimal ability to stand, walk, and perform basic daily activities.  (*Id.*)  Furthermore, the ALJ relied on evidence that

Plaintiff was able to drive herself to a September 2011 examination and that she reported engaging in various travels in 2011.  (*Id.*)

The ALJ determined that the great weight of the evidence demonstrates that Plaintiff has no limitations caring for herself, driving, or engaging in other daily activities, despite her claims to the contrary.  (*Id.*)  The ALJ also recognized major inconsistency between the medical records from San Ysidro and the complaints Plaintiff alleged at the hearing and in her disability reports, noting that if Plaintiff truly had the inability to engage in daily living activities, such complaints would appear in her clinical outpatient records.  (*Id.*)  Thus, the ALJ found that although Plaintiff does have some medically determined physical and mental impairments which could be expected to produce some symptoms, the intensity and persistence of the pain alleged by Plaintiff is exaggerated.  (*Id.*)

### e.  ALJ's Determination

Accordingly, the ALJ concluded that even though Plaintiff has medically determinable impairments, they do not significantly limit her ability to perform basic work-related activities. (*Id.* at 33.)  Therefore, Plaintiff does not have a severe impairment or combination of impairments.  (*Id.*)  Thus, the ALJ found that Plaintiff did not satisfy step two, and is, therefore, not disabled.  (*Id.* at 33, 37.)

On May 1, 2014, Plaintiff requested review of the ALJ's decision.  (*Id.* at 19.)  On September 2, 2015, the Office of Disability Adjudication and Review denied Plaintiff's request for review of the ALJ's decision.  (*Id.* at 1.)

## V.   SCOPE OF REVIEW

Section 205(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of a final agency decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited.  *Id.*  This Court has jurisdiction to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  *See id.*; 20 C.F.R. § 404.900(a)(5).  The matter may also be remanded to the Social Security Administration for further proceedings.  *Id.*

1     The Commissioner's decision must be affirmed upon review if it is: (1) supported

2  by "substantial evidence" and (2) based on proper legal standards.  *Uklov v. Barnhart*,

3  420 F.3d 1002, 1004 (9th Cir. 2005).  If the Court, however, determines that the ALJ's

4  findings are based on legal error or are not supported by substantial evidence, the Court

5  may reject the findings and set aside the decision to deny benefits.  *Aukland v.*

6  *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  Substantial evidence is more than a

7  scintilla but less than a preponderance.  *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir.

8  2003).  It is "relevant evidence that, considering the entire record, a reasonable person

9  might accept as adequate to support a conclusion."  *Id.*; s*ee also Howard ex rel. Wolff v.*

10  *Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record

11  despite the ALJ's failure to discuss every piece of evidence).  "Where evidence is

12  susceptible to more than one rational interpretation," the ALJ's conclusion must be

13  upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## VI.   WHETHER THE ALJ IMPROPERLY ERRED IN FINDING THAT PLAINTIFF'S MENTAL IMPAIRMENTS WERE NOT SEVERE

16     Plaintiff's argument regarding the ALJ's determination that her mental

17  impairments were not severe contains multiple issues.  The Court has addressed these

18  issues separately below.

### A. Whether the ALJ Erred in Discounting the Treating Source Opinion of Dr. Brolaski

#### 1.  Parties' Arguments

22     Plaintiff argues that the ALJ improperly discredited Dr. Brolaski's mental

23  impairment questionnaire.  Because Dr. Brolaski is Plaintiff's treating physician, she

24  argues that his opinion regarding her functional limitations should have been given

25  controlling weight.  (ECF No. 11-1 at 27.)  Defendant counters that the ALJ's rejection of

26  Dr. Brolaski's mental impairment questionnaire was proper, and based on inconsistencies

27  between Dr. Brolaski's own medical findings and the record as a whole.  (ECF No. 14-1

28  at 7.)

### 2. Relevant Law

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.

In contrast, a contradicted opinion of a treating or examining medical professional may be rejected for "specific and legitimate" reasons that are supported by substantial evidence.  *Id.* at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  However, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

### 3. Discussion

The ALJ gave Dr. Brolaski's "checkbox-style form" no weight, stating that "the medical findings submitted by this physician and otherwise documented in the record do not support a finding that the claimant's medical condition is of disabling severity, nor does the treating physician provide an assessment of the claimant's residual functional capacity which is compatible with the record as a whole."  (AR at 36.)  According to the ALJ, Dr. Brolaski appeared to have taken Plaintiff's subjective allegations at face value

and merely reiterated those allegations in his report and when making his assertions regarding Plaintiff's ability to work.  (*Id.*)  As a result, the ALJ noted that he "duly considered" the treating physician's opinions, but did not find them persuasive or controlling.  (*Id.*)

In *Batson v. Comm'r of Soc. Sec. Admin.*, the Ninth Circuit upheld an ALJ's decision discounting the treating physician's view because it was in the form of a checklist, did not have supporting objective evidence, was contradicted by other statements and assessments of Plaintiff's medical condition, and was based on plaintiff's subjective descriptions of pain.  359 F.3d 1190, 1195 (9th Cir. 2004).  Similarly here, Dr. Brolaski opined in checklist format that Plaintiff was seriously limited in nearly every area of functioning, yet failed to explain how he reached his conclusions and did not include the medical or clinical findings to support his assessment.  (AR at 600-05.)  Indeed, Dr. Brolaski's medical statement contained no narrative language whatsoever.

Moreover, not only did the ALJ find that Dr. Brolaski's opinion was unsupported, he also found that it was in contradiction to his own treatment records regarding Plaintiff. Specifically, the ALJ noted that Dr. Brolaski's assessment was "inconsistent with his own mild clinical findings and those of his facility[.]"  (*Id.* at 36)  Thus, given that an ALJ may discredit a treating physician's opinions that are conclusory, brief, and unsupported by the record as a whole, it was not legal error for the ALJ to discount Dr. Brolaski's opinions in this case since they were in the form of a checklist, and unsupported by objective evidence from Dr. Brolaski and his staff.[5]  *See also Tonapetyan v. Halter*, 242

---

[5] Plaintiff's reliance on *Van Dyke v. Colvin*, 2015 WL 1457953 (C.D. Cal. Mar. 30, 2015) is misplaced. In *Van Dyke*, the Court found that the ALJ erred when he relied on the opinion of an examining physician to conclude that the contrary opinion of a treating source was inconsistent with the record as a whole.  *Id.*  Here, however, the ALJ determined that the medical source statement from Plaintiff's treating physician was unpersuasive based on the fact that it was (1) inconsistent with his own mild clinical findings and those of his facility, (2) inconsistent with the absence of a more intensive treatment, and (3) inconsistent with the findings and assessments of the consultative examiners.  (AR 36.)  The ALJ further concluded that Dr. Brolaski appeared to rely on Plaintiff's subjective complaints, which the ALJ found to be not credible.  (*Id.*)  Unlike in *Van Dyke*, the opinions of the examining physicians were

19

F.3d 1144, 1149 (9th Cir. 2001).  Therefore, the Court **RECOMMENDS** that summary judgment be **DENIED** on this basis.

### B. Whether the ALJ Erred in Deferring to the Conclusions of the State Agency Examiners

#### 1. Parties' Arguments

Plaintiff argues that the ALJ improperly afforded significant weight to the assessments of state agency examiners Drs. Soliman and Trimble, which Plaintiff states are internally contradictory and not based on a review of Plaintiff's treatment history. (ECF No. 11-1 at 27.)  As such, Plaintiff argues that these reports are entitled to little to no weight in the determination of her overall mental function.[6]  (*Id.*)  Defendant does not address this argument in her motion for summary judgment.

#### 2. The ALJ Did not Err in Affording Weight to Dr. Soliman's Report

First, the Court takes issue with Plaintiff's characterization of Dr. Soliman's medical report.  Specifically, Plaintiff argues that Dr. Soliman found soft speech with decreased rate and rhythm; a depressed mood with congruent affect; decreased concentration and energy; and reports of auditory hallucinations "that were sufficient for him to endorse the diagnoses of major depression with psychotic features and post-traumatic stress disorder with a current GAF of 60."  (ECF No. 11-1 at 25-26.)  While these conclusions are found in Dr. Soliman's report, these statements do not paint a clear

---

but one factor in the ALJ's ultimate determination that Dr. Brolaski's medical source statement was unpersuasive.

[6] Plaintiff also argues in passing, without citing to any legal authority, that the ALJ had a duty to seek clarification from these examining physicians to clarify the alleged inconsistencies in their reports. (ECF No. 11-1 at 26.)  Although the Court does not agree that these reports are inconsistent, the requirement that the ALJ seek additional information is triggered only when the evidence from the *treating* medical source is inadequate to make a determination as to the claimant's disability.  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)(emphasis added).  Moreover, the ALJ did not make a finding that the report was inadequate to make a determination regarding Plaintiff's disability.  Instead, the ALJ recounted the conclusions of the examining physicians as assessing that Plaintiff had "no mental restrictions in her ability to function in a work setting."  (AR 36.)

picture of his overall assessment of Plaintiff.[7]

For example, Dr. Soliman concluded, based on Plaintiff's own admissions, that Plaintiff could perform the following activities of daily living: cooking, cleaning, shopping, errands, personal hygiene, and financial responsibilities.  (AR at 424.)  Dr. Soliman noted that Plaintiff "is able to focus on daily activities[,]" that her abstract thinking was normal, and her "insight was good."  (*Id.* at 425.)  With respect to Plaintiff's affective status, Dr. Soliman stated: "The claimant's mood was depressed.  Affect was congruent.  The claimant denied current suicidal ideations.  The claimant denies current homicidal ideations . . ."  (*Id.*)  Dr. Soliman stated that, from a psychiatric standpoint, Plaintiff "is able to understand, carry out, and remember simple and complex instructions.  The claimant is able to interact with co-workers, supervisors, and the general public.  The claimant is able to withstand the stress and pressures associated with an eight-hour workday, and day-to-day activities."  (*Id.* at 426.)

The Court, therefore, disagrees with Plaintiff's argument that Dr. Soliman's clinical findings are incompatible with a determination that Plaintiff has no functional

---

[7] Plaintiff emphasizes the fact that both examining physicians gave Plaintiff a GAF of 60, which, she argues, contradicts the ALJ's determination that her mental impairment was not severe.  The GAF scale provides a measure for an individual's overall level of psychological, social, and occupational functioning.  *Am. Psych. Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed.1994).  The scale "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  *Id.*  A GAF score of 60 indicates moderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) or moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers).  *Id.* at 32.  As noted in the regulations, "[t]he GAF scale ... does not have a direct correlation to the severity requirements in [SSA's] mental disorders listings."  *Revised Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed.Reg. 50746, 50764–65 (Aug. 21, 2000).  Thus, in evaluating the severity of Plaintiff's mental impairment, a GAF score may help guide the ALJ's determination, but an ALJ is not bound to consider it.  *Orellana v. Astrue*, 2008 WL 398834, at *9 (E.D. Cal. Feb.12, 2008) ("While a GAF score may help the ALJ assess Plaintiff's ability to work, it is not essential and the ALJ's failure to rely on the GAF does not constitute an improper application of the law.")  Accordingly, although the ALJ did not specifically address Drs. Soliman and Trimble's opinion that Plaintiff's GAF was 60, the ALJ was not bound to consider it.  Rather, in compliance with 20 C.F.R. § 404.1520a, the ALJ reviewed the evidence, and concluded that Plaintiff did not have a severe mental impairment.  (AR at 36.)  Therefore, the ALJ did not err in failing to conclude that Plaintiff had a severe mental impairment, despite being assigned a GAF of 60 by Drs. Soliman and Trimble.

limitations.  Dr. Soliman acknowledged that Plaintiff suffered from depression and post-traumatic stress disorder.  He acknowledged this manifested itself in a depressed mood and some auditory hallucinations, but concluded that, despite these symptoms, Plaintiff's ability to function in a work setting would not be impaired.  Dr. Soliman based his conclusions on his own medical assessments of Plaintiff, as well as Plaintiff's admissions during the course of the evaluation.

While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict.  *Andrews*, 53 F.3d at 1041 (citing *Magallanes*, 881 F.2d at 751.).  The Court finds that the ALJ's determination to afford significant weight to the opinion of Dr. Soliman, even though contradicted by Dr. Brolaski's medical source statement, is supported by substantial evidence.  It is, therefore, **RECOMMENDED** that summary judgment be **DENIED** on this basis.

### 3.  The ALJ Did not Err in Affording Weight to Dr. Trimble's Report

According to Plaintiff, Dr. Trimble, on his mental status examination, found that Ms. Cyprain could not recall significant dates from the past or repeat three words that were presented to her at the beginning of the interview after a significant delay; that she was unable to name the most recent past president of the United States or the current or former governor of California; that she appeared to be of low-average intelligence; and that she made significant mistakes in serial sevens and two mistakes on spelling the word "world" in reverse."  (ECF No. 11-1 at 26.)

While these statements are found in Dr. Trimble's report, Plaintiff again grossly mischaracterizes the overall conclusions of Dr. Trimble.  It is true that Dr. Trimble stated with respect to intellectual functioning that Plaintiff was "credible in the Mental Status Examination portion of the interview" (AR at 609), but he also stated that, with respect to the validity of the test results, they should not be "considered to be a good representation of claimant's psychological functioning, as she did not appear to put forth much effort."

(*Id.* at 610.)  Dr. Trimble ultimately concluded that, "[w]hile she may display some mild cognitive deficiencies associated with depression, she appeared to be exaggerating these symptoms in order to appear more disabled than she actually is.  Accordingly, these results should be interpreted with caution."  (*Id.*)

Again, similar to Dr. Soliman, Dr. Trimble acknowledged that Plaintiff may suffer from depression, but concluded that, despite these symptoms, Plaintiff's ability to function in a work setting would not be impaired.  (*Id.* at 612-13.)  Dr. Trimble based his conclusions on his own medical assessments of Plaintiff, as well as Plaintiff's admissions during the course of the evaluation.  The Court finds that this constitutes substantial evidence in support of the ALJ's decision to afford greater weight to the opinion of Dr. Trimble than the medical source statement by Dr. Brolaski.  It is, therefore, **RECOMMENDED** that summary judgment be **DENIED** on this basis.

### C. Step Two Analysis that Mental Impairment is Not Severe

#### 1.  Parties' Arguments

According to Plaintiff, the ALJ based his determination that Plaintiff's mental impairments were not severe on three reasons: 1) Plaintiff has not required an inpatient psychiatric care; 2) Plaintiff consistently performed well on mental status testing, showing no signs of psychosis or significant deficits of mood, behavior or cognitive functioning; 3) Plaintiff's inconsistent statements regarding her symptoms.  (ECF No. 11-1 at 19-21.)  The Court notes that the ALJ did not rely on any of these factors in isolation, but used them in combination with the conclusions of the examining physicians to ultimately conclude that Plaintiff's mental impairments were not severe.  The Court will address each of Plaintiff's arguments separately, but will analyze the totality of the record when determining whether or not the ALJ's decision was supported by substantial evidence in the record.  *Uklov*, 420 F.3d at 1004.

#### 2.  Relevant Law

A severe impairment or combination of impairments within the meaning of Step Two exists when there is more than a minimal effect on an individual's ability to do basic

work activities.  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005); *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit [a person's] physical or mental ability to do basic work activities."). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing, hearing and speaking, understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b); *Webb*, 433 F.3d at 686.  If the plaintiff meets her burden of demonstrating she suffers from an impairment affecting her ability to perform basic work activities, "the ALJ must find that the impairment is 'severe' and move to the next step in the SSA's five-step process." *Edlund v. Massanari*, 253 F.3d 1152, 1160 (9th Cir. 2001); *Webb*, 433 F.3d at 686.

### 3. Discussion

#### a. Whether the ALJ erred in relying on Plaintiff's lack of Inpatient Care in Finding her Mental Impairments not Severe

According to Plaintiff, the ALJ improperly concluded that she did not have a severe mental impairment based on the incorrect assumption that a mental impairment is not severe if it has not required inpatient care.  (ECF No. 11-1 at 20.)  Defendant counters that the ALJ did not state that Plaintiff needed to have been hospitalized for her impairment to be considered severe, but that had Dr. Brolaski's highly restrictive assessment regarding marked mental limitations been valid, it would be reasonable to see a greater level of treatment.  (ECF No. 14-1 at 6 citing AR at 36).  The Court agrees that the ALJ did not conclude that Plaintiff could not have a severe mental impairment because she had not required any inpatient psychiatric care.  Nor did the ALJ characterize Plaintiff's treatment as "conservative," as Plaintiff suggests.

Instead, the ALJ concluded that there was a *lack of evidence* to support a finding of a severe mental impairment—one example of the lack of evidence was a lack of inpatient care. (AR at 36.)  The ALJ went on to note that, "despite attending outpatient therapy sessions, the claimant has consistently performed well upon mental status testing, showing no signs of psychosis or significant deficits in mood, behavior or cognitive functioning." (*Id.*)  This sentence denotes that, had the ALJ found such results in the record, he *might* have determined Plaintiff to have a severe mental impairment, despite no history of inpatient care.  Plaintiff misinterprets the ALJ's conclusion, and, given the Court's reading of the ALJ's opinion, the Court finds no error in this statement by the ALJ.  It is, therefore, **RECOMMENDED** that summary judgment be **DENIED** on this basis.

### b. Whether the ALJ Erred in Relying on Plaintiff's Performance on Mental Status Testing in Finding her Mental Impairments not Severe

#### i. Parties' Arguments

Plaintiff states that the ALJ makes a "totally false assertion that Ms. Cyprain has 'consistently performed well on mental status testing, showing no signs of psychosis or significant deficits of mood behavior, or cognitive functioning." (ECF No. 11-1 at 21 citing AR at 36.)  Plaintiff argues that Dr. Rene's treatment notes from her mental status examinations show otherwise. (*Id.* citing AR at 408, 401, 398, 397, 395, 391, 388, 382, 375, 487, 481, 467, 460, 533.)  Plaintiff also argues that contrary evidence exists in Dr. Brolaski's treatment notes (*id.* citing AR at 376, 586, 585, 584, 583, 581) and Dr. Soliman's consultative examination (*id.* citing AR at 422, 425).

Defendant, in contrast, argues that the ALJ has not misrepresented the record regarding Plaintiff's performance on mental status examinations.  Defendant states that, while the notes reflect Plaintiff's symptoms of depression, the records for the most part show no cognitive deficits in memory or thought content. (ECF No. 14-1 citing AR at 374-376, 378, 380, 382, 386, 388-393, 395-398,401-408, 455, 457-461, 463, 465, 467-

468, 471, 474-477, 480-481, 482-383, 485, 520-522, 533-535, 586-577, 580-586, 589.)

Defendant also argues that, although Dr. Brolaski's notes reference auditory

hallucinations, that occurred at a time when Plaintiff admitted to relapsing to cocaine use.

(*Id.* citing AR at 581-586.)  Defendant notes that Dr. Trimble reported no complaints of

auditory hallucinations, and, although Dr. Soliman reported auditory hallucinations, upon

examination he found no signs of psychosis or abnormal behavior.  (*Id.* citing AR at 608-

09, 425.)

### ii.    Discussion

The Court acknowledges that Plaintiff had therapy sessions in which she was

reported as having a normal affect, as well as numerous other sessions where Plaintiff is

reported as depressed (AR at 375, 379, 382, 388, 391, 397, 398, 401, 403, 405, 406, 408,

460, 465, 467, 477, 480, 487, 494), tearful (*id.* at 382, 391, 397, 398, 403, 467, 477) and

suicidal (*id.* at 382, 383, 388, 397, 398, 405, 477, 480).  However, these statements in

treatment notes cannot be viewed in isolation, but must be interpreted in the context of

the record as a whole.  For example, although the examining physicians both found that

Plaintiff had depression (*id.* at 425 [Dr. Soliman]; *id.* at 610 [Dr. Trimble]), they also

concluded that this diagnosis did not impact Plaintiff's ability to work.  (*Id.* at 426 [Dr.

Soliman]; *id.* at 612-13 [Dr. Trimble].)

The standard under step two is whether or not the impairment has more than a

minimal effect on an individual's ability to do basic work activities.  *Webb*, 433 F.3d at

686; *Mayes*, 276 F.3d at 460; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An

impairment or combination of impairments is not severe if it does not significantly limit

[a person's] physical or mental ability to do basic work activities.").  Despite Plaintiff's

diagnosis of depression, there is nothing in the record (other than Dr. Brolaski's mental

status assessment which has already been discredited) which supports a conclusion that

Plaintiff is even *minimally* impacted in her ability to understand, carry out, and remember

simple instructions, use judgment, respond appropriately to supervision, co-workers and

usual work situations, and deal with changes in a routine work setting.  20 C.F.R. §§

404.1521(b), 416.921(b); *Webb*, 433 F.3d at 686.

Although the record contains certain statements by Plaintiff that she is often suicidal, those statements must be balanced with the determination by the ALJ that Plaintiff lacks credibility (AR at 36-37) (a determination also supported by substantial evidence, *see* below at (c)(3)), and Plaintiff's own admissions that she uses threats of suicide to get attention. (*See id.* at 375.)  Given this evidence in the record which includes the determinations of Drs. Soliman and Trimble, the ALJ's credibility determination of Plaintiff (discussed in more detail in section VI(C)(3)(c), below), and Plaintiff's own admissions which undermine the veracity of her symptoms, the Court finds that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's mental impairments were not severe, and did not more than minimally impact her ability to work, despite there being some evidence of Plaintiff's depression in the record in the form of her mental status examinations.  As such, the Court **RECOMMENDS** a finding that summary judgment be **DENIED** on this basis.

### c.  Whether the ALJ Erred  in relying on Plaintiff's Inconsistent Statements in Finding her Mental Impairments not Severe

#### i.  Parties' Arguments

Plaintiff argues that the ALJ's conclusion that Plaintiff was inconsistent in reporting her symptoms was "contrary to the actual content of the record."  (ECF No. 11-1 at 21-22.)  Plaintiff also argues that periods of improvement, in the context of mental impairments, are not inconsistent with disability.  (*Id.* at 22.)  Defendant does not address this argument in her brief.

#### ii.  Relevant Law

The Ninth Circuit has established a two-step analysis for the ALJ to evaluate the credibility of a claimant's testimony regarding subjective pain and impairments.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2008) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether Plaintiff presented objective medical evidence of an impairment or impairments that could reasonably be

expected to produce the pain or other alleged symptoms.  *Vasquez*, 572 F.3d at 591.

Second, if Plaintiff satisfies the first step and there is no affirmative evidence of malingering, the ALJ may reject a plaintiff's testimony only if he provides "specific, clear and convincing reasons" for doing so.  *Id.*; *see also Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (citing *Lester*, 81 F.3d at 834).  These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n. 3 (9th Cir. 2010) (citation omitted).

In weighing the credibility of a plaintiff's testimony, the ALJ may use "ordinary techniques of credibility determination."  *Id.*  The ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains."  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

### iii.   Discussion

The Court cannot discern the basis of Plaintiff's argument here, and the law cited by Plaintiff concerns different legal standards in the social security analysis.  Some cases concern the legal standards applied in analyzing what weight to afford treating physicians.  *See e.g., Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001)(finding that the ALJ erred in selectively relying on treatment notes showing improvement when discounting the opinion of a treating physician); *Lester*, 81 F.3d at 833 (analyzing the ALJ's discounting of a treating physician's opinion based on medical records evidencing sporadic improvement).  While one case discuss the credibility analysis by the ALJ.  *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (analyzing the ALJ's finding that plaintiff lacked credibility based on select periods of improvement over the course of a plaintiff's treatment).  Notably, the ALJ did not discuss Plaintiff's inconsistent statements when ultimately concluding that Plaintiff's treating physician's opinion had little probative value.  Therefore, many of the cases Plaintiff

cites are inapplicable.

As for the ALJ's credibility analysis, it appears that Plaintiff has conflated the two separate steps the ALJ must take in determining a Plaintiff's credibility. In the first step of his analysis, the ALJ determined that the *evidence* submitted by Plaintiff did not support her claims that her depression constituted a severe mental impairment. (AR at 36.) As one of many examples of the lack of evidence, the ALJ noted that Plaintiff had made inconsistent statements regarding her mental impairments. (*Id.*) For example, the ALJ noted that Plaintiff had often denied issues with suicidal ideation or psychosis during her visits to the San Ysidro Center. (*Id.*) During some visits, Plaintiff also reported feeling fine or experiencing improvement. (*Id.*) While she did mention auditory hallucinations during her examination by Dr. Soliman, *she showed no signs of psychosis*. (*Id.*) The inconsistency between her statements and the test results, among other things, is what led the ALJ to conclude that the *medical evidence* failed to support a finding of a severe mental impairment. (*Id.*) (The Court has already analyzed and determined that the medical record provided substantial evidence in support of the ALJ's decision regarding Plaintiff's severe mental impairment, *see* section VI(C)(3)(b), above.)

The ALJ could have stopped at this first step, but proceeded to analyze the second step where he concluded that Plaintiff lacked credibility. (*Id.* at 36-37.) For example, the ALJ noted that Plaintiff gave inconsistent statements regarding her mental health issues:

> sometimes asserting depression based on a traumatic personal history and other times just claiming she has a learning disorder. The claimant has also given highly inconsistent statements regarding her ability to perform daily living activities. At the hearing and in the disability reports filed by the claimant and her relatives, she reported having minimal ability to stand, walk, lift, carry and perform personal care tasks, daily activities and household chores. However, the claimant denied any problems engaging in such activities during her evaluation with Drs. Soliman and Trimble. The claimant was also noted to be able to drive herself to Dr. Soliman's

examination and admitted to engaging in travel in 2011 records from the San Ysidro Center.

(*Id.* at 37.)

In making a credibility determination, the ALJ may consider the "inconsistencies either in [a plaintiff's] testimony or between his testimony and his conduct[.]"  *Light*, 119 F.3d at 792.  Therefore, the Court need only determine whether the ALJ's interpretation of Plaintiff's statements as inconsistent is reasonable, and supported by substantial evidence.  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  If so, it not this Court's place to second guess the ALJ's determination.  *Id.*  The Court finds that the ALJ's conclusion to discount Plaintiff's credibility based on her inconsistent statements is reasonable.  Substantial evidence supports the conclusion that Plaintiff reported being able to perform certain activities of daily living to her examining physicians, and stated otherwise during the hearing before the ALJ.  For example, she reported to Dr. Soliman that she could cook, clean, shop, run errands, take care of her personal hygiene and her financial responsibilities.  (AR at 424.)  When meeting with Dr. Trimble, she again reported being able to do household chores, errands, shopping, driving and cooking.  (*Id.* at 608.)  She reported that she is able to dress herself, bathe herself, and take care of her personal hygiene.  (*Id.*)  Dr. Trimble determined that, although Plaintiff was financially supported by her family, she was capable of paying her own bills and handling her own money.  (*Id.*)  These statements are in stark contrast to Plaintiff's testimony at the hearing before the ALJ where she stated that she does not clean or cook at home because she "can't."  (*Id.* at 57.)  Plaintiff also testified that all she does when she is home alone is stare at the wall in her room, and that she does not leave the house.  (*Id.* at 64.)

The Court finds that the ALJ's conclusion to discount Plaintiff's credibility based on her inconsistent statements is reasonable and based on substantial evidence in the record, as explained above.  Because the ALJ provided "specific, clear and convincing reasons" for discounting Plaintiff's credibility (*Vasquez*, 572 F.3d at 591), and because that assessment should be given "great weight[,]" this Court **RECOMMENDS** a finding that

the ALJ did not err in in relying on Plaintiff's inconsistent statements in finding her mental impairments not severe, and summary judgment be **DENIED** on that basis. Dominguez v. Colvin, 927 F.Supp.2d 846, 865 (C.D. Cal. 2013).

### 4. Conclusion

Because the Court finds that the ALJ's decision was supported in each instance by substantial evidence, it also finds that the overall conclusion of the ALJ that Plaintiff's mental impairments were not severe was supported by substantial evidence.  Therefore, the Court **RECOMMENDS** a finding that summary judgment be **DENIED** on this basis.

## VII.   ALJ'S FINDING THAT PLAINTIFF'S CARPAL TUNNEL SYNDROME IS NOT SEVERE

### A. Parties' Arguments

Plaintiff argues that the ALJ ignored evidence in the record when determining that Plaintiff's carpel tunnel syndrome did not meet the criteria of a severe impairment.  (ECF No. 11-1 at 27.)  Specifically, Plaintiff points to the November 2011 examination by neurologist Ghausi which showed evidence of severe carpal tunnel syndrome of the right and mild carpal tunnel syndrome on the left.  (*Id.* citing AR at 436-37, 446-48.)

Defendant acknowledges that the ALJ erroneously noted that Plaintiff did not use wrist splints, but argues that the error was reasonable because there was little evidence that Plaintiff actually used wrist splints, as most medical reports after November 2011, do not mention the use of wrist splints (AR at 462, 464, 523, 527, 534, 559, 566, 567, 573, 578, 641, 647, 653, 664, 670, 676).  Defendant argues that it was Plaintiff's burden to submit sufficient evidence to show an impairment in function, and Plaintiff did not do so. (ECF No. 14-1 at 10.)

### B. Relevant Law

As mentioned above, a severe impairment or combination of impairments within the meaning of Step Two exists when there is more than a minimal effect on an individual's ability to do basic work activities.  *Webb*, 433 F.3d at 686; *Mayes*, 276 F.3d at 460; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination

of impairments is not severe if it does not significantly limit [a person's] physical or mental ability to do basic work activities.").  Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing, hearing and speaking, understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b); *Webb*, 433 F.3d at 686.  If the plaintiff meets his burden of demonstrating he suffers from an impairment affecting his ability to perform basic work activities, "the ALJ must find that the impairment is 'severe' and move to the next step in the SSA's five-step process."  *Edlund*, 253 F.3d at 1160; *Webb*, 433 F.3d at 686.

### C. Discussion

With respect to Plaintiff's complaints of body pain/fibromyalgia and carpal tunnel syndrome, the ALJ stated the following:

> Apart from various pain medications, there is no indication the claimant has required surgery, physical therapy or pain management . . .There is no evidence the claimant has received any treatment for her reported carpel tunnel syndrome or that she requires surgery or even the use of conservative modalities such as wrist splints.  In addition, apart from that single mention of carpal tunnel in the evidence, no further complaints regarding wrist pain are cited in the evidence.  Finally, no treating or examining medical source has assessed the claimant as wholly incapable of sustaining work activity due to any medical condition.

(AR at 35-36.)

Plaintiff was evaluated by neurologist Dr. Ghausi and neurology resident Nikolskaya in November of 2011.  (*Id.* at 441-43.)  Dr. Ghausi wrote that he suspected "two etiologies, one is severe CTS on the right, mild on the left, and superimposed de Quervain's tenosynovitis.  Conservative treatments for both counseled.  EMG to quantify

severity. Splinting bilaterally.  Follow up with PMD for consideration of steroid injection for tenosynovitis." (*Id.* at 440.)  Plaintiff had an EMG/NCS lab procedure on November 22, 2011, which concluded that there were "median nerve lesions at the wrists bilaterally (e.g. carpal tunnel syndrome), extremely severe on the right and mild to moderate on the left." (*Id.* at 437.)

While the record clearly shows that Plaintiff has carpal tunnel syndrome with some associated symptoms, as noted by the ALJ there is no clinical evidence of—and no medical opinion source has assessed any—actual work-related limitations stemming from that impairment.  (*See id.* at 441-443, 440, 436-37; *see also Burch*, 400 F.3d at 682 (holding that a medical impairment is deemed "'severe' . . .  when alone or in combination with other medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.") (internal quotation marks omitted).)  Indeed, where no doctor has placed restrictions on Plaintiff's activities or ordered surgery based upon carpal tunnel syndrome, the ALJ properly concluded that her carpal tunnel syndrome was not severe.[8] *Banks v. Massanari*, 258 F.3d 820, 827, 75 Soc. Sec. Rep. Serv. 8, Unempl. Ins. Rep. (CCH) ¶16675B (8th Cir. 2001).

As a result, the Court **RECOMMENDS** a finding that substantial evidence supports the ALJ's conclusion that Plaintiff's carpal tunnel syndrome was not a severe impairment, and summary judgment should be **DENIED** as to this issue.

## VIII.   CONCLUSION

Having reviewed the matter, the undersigned Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Commissioner's cross-motion for summary judgment be **GRANTED**.  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge

---

[8] The Court acknowledges the treatment note from Dr. Ghausi referring Plaintiff to see a specialist for consideration of surgical intervention.  (AR at 558.)  However, nothing in the record indicates that Plaintiff ever followed through on this referral, or that any specialist ever ordered surgical intervention.

1  assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

2      **IT IS ORDERED** that no later than **December 30, 2016**, any party to this action

3  may file written objections with the Court and serve a copy to all parties. The document

4  should be captioned "Objections to Report and Recommendation."

5      **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

6  the Court and served on all parties no later than **January 13, 2017**.

7

8  Dated:  December 16, 2016

9

10                             Hon. Bernard G. Skomal
                           United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15cv2413-BAS-BGS